**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.  17-cv-1936

GREGORY HEARD

> Plaintiff,

v.

GREG DULAYEV, individually,
CITY AND COUNTY OF DENVER, a municipality,

> Defendants.

---

**CIVIL RIGHTS COMPLAINT WITH REQUEST FOR TRIAL BY JURY**

---

Plaintiff Gregory Heard, by and through his attorneys, HOLLAND, HOLLAND EDWARDS &

GROSSMAN, P.C., complains against Defendants and request a trial by jury as follows:

**I.  INTRODUCTION**

1.      On June 3, 2016, Gregory Heard, an unarmed African American homeless man,

was subjected to unreasonable and excessive force by Officer Dulayev, who tased him and

shoved his face into the dirt while he was unarmed and obviously complying with officer

commands to surrender.

2.      After tasing and shoving Mr. Heard to the ground, this Defendant, another police

officer present at the scene, and the Investigating Supervisor, knowingly prepared false police

reports in an overt effort to cover up this grossly excessive force. They thus falsely asserted that

Mr. Heard was disobeying police commands, aggressively advancing towards and threatening

the officers, when in fact he was doing nothing at the time besides complying with the officer's instructions to come out from behind the bushes.

3.      The Denver Police Department determined that Officer Dulayev's conduct was consistent with policy and his training as a Denver Police Officer.

## II.  JURISDICTION, VENUE AND NOTICE

4.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. § 1988.

5.      The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331.

6.      This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

## III.  PARTIES

7.      At all times relevant hereto, Plaintiff Gregory Heard was a resident of the State of Colorado in Denver, and a citizen of the United States of America.

8.      At all times relevant hereto, Defendant Greg Dulayev was a citizen of the United States and a resident of the State of Colorado and was acting under color of state law in his capacity as a law enforcement officer with the Denver Police Department.

9.      The City and County of Denver ("Denver") is a Colorado municipal corporation. Denver's Department of Safety is responsible for the oversight, supervision, and training of the Denver Police Department ("DPD"). Denver was at all relevant times the employer of Officer Dulayev and is a proper entity to be sued under 42 U.S. C. § 1983.

## IV.  STATEMENT OF FACTS

10.     Plaintiff hereby incorporates all of the forgoing paragraphs of this Complaint as if fully set forth herein.

11.     Gregory Heard is a 53 year-old African American man who was homeless.

12.     On June 3, 2016, Gregory Heard and another homeless man got into a fight.

13.     Denver police officers Greg Dulayev and Adrian Enriquez responded to a call reporting this incident at 1950 N. Clarkson St in Denver.

14.     The interactions between the officers and Mr. Heard was captured on Officer Dulayev's bodycam video.[1]

15.     Some of the initial communications between Mr. Heard and Officer Dulayev can also be heard faintly in the background from Officer Enriquez's camera.

16.     As was captured on video, when the officers arrived, Mr. Heard was in or behind some bushes.

17.     The other man had already come out from behind the bushes as he was instructed to do by Officer Enriquez.

18.     Before starting to come out from behind the bushes, Mr. Heard showed Officer Dulayev both palms of his empty hands, clearly demonstrating on the video that he was unarmed and surrendering, which was known to Officer Dulayev, as shown here:

---

[1] This Video is attached to the Complaint as **Exhibit 1**.



19.     Mr. Heard at one point asks Officer Dulayev "are you ready", asking whether it was ok for him to come out at that time and surrender.

20.     Officer Dulayev can be heard saying "hands up."

21.     Mr. Heard responds, "My hands are up, man. My hands are up, okay?"

22.     Mr. Heard's empty hands and surrendering gestures were clearly visible to Officer Dulayev.

23.     Officer Dulayev admitted in his police report that he "did not observe any weapons" at the time.

24.     Officer Dulayev instructed Mr. Heard to come out from behind the bushes.

25.     Officer Dulayev stated as follows: "Crawl out. Crawl out on your hands and knees".

26.     Officer Dulayev pointed his taser at Mr. Heard, and then needlessly threatened and cursed at him, yelling: "I'll fucking tase you."

27.     Before his was tased, Mr. Heard can be heard pleading: "Don't tase me man."

28.     In proceeding to come out from behind the bushes as instructed, Mr. Heard crawled out, stood up slowly, and ducked a little bit in order to avoid an overhanging branch from the tree like this:





29.   Having commanded him to come out from the bushes, Officer Dulayev then suddenly yelled "stop right there" while Mr. Heard was following his previous command and coming out from behind the bushes.

30.   Immediately thereafter, as Mr. Heard was still in the process of taking a couple steps forward *in order to comply with the officers' command from seconds ago that he get out from behind the bushes*, Officer Dulayev fired his taser.

31.   Immediately after being tased, Mr. Heard cried out in pain and clutched his abdomen as shown here:



32.   He collapsed to his knees in pain, completely in shock and disabled by the taser.

33.   Officer Dulayev then jumped on him and aggressively shoved his face into the dirt.

34.     While placing him in handcuffs, these officers repeatedly falsely accused him of resisting despite Mr. Heard then being disabled on the ground from just having been tased, in order to cover up the fact that it was utterly without justification.

35.     Officer Dulayev threatened to tase him again.

36.     Mr. Heard was not resisting but simply trying to breathe, while writhing on the ground in pain.

37.     He kept begging to be let up or rolled onto his stomach and saying "I can't breathe." He felt like he was going to die and could not get air.

38.     Officer Dulayev ignored these statements and at one point callously remarked, "You're talking, so you can breathe."

39.     Mr. Heard was bleeding from his mouth and nose from being forcefully taken down and shoved into the ground by Officer Dulayev.

40.     Mr. Heard was never given a chance to peacefully surrender and comply with Officer Dulayev's commands.

41.     It was not more than five seconds from when Officer Dulayev can be heard on video telling him to come out from the bushes to when he was needlessly tased in the chest and shoved to the ground.

42.     At no time did Mr. Heard appear agitated or aggressive towards Officer Dulayev.

43.     At no time did Mr. Heard demonstrate any sort of physical resistance or try to escape from Officer Dulayev.

44.     Mr. Heard's facial expression and body movements were all non-threatening.

45.     His arms were at his sides and his body language clearly indicated he was in no way trying to fight these officers.

46.     Nevertheless, as Mr. Heard was trying to comply with officer commands to come out from the bushes and surrender, Officer Dulayev tased him in his abdomen from a close range.

47.     Mr. Heard was taken to St. Presbyterian Hospital following this excessive use of force. The doctor found in addition to being tased, Mr. Heard had "abrasions on his nose" from being taken down by the police.

48.     Mr. Heard was then taken to jail.

49.     This use of force on an unarmed, non-aggressive, and surrendering arrestee was grossly excessive.

50.     Mr. Heard was not charged with any crime directed at law enforcement.

51.     Following this incident, Officer Dulayev, Officer Enriquez, and the City of Denver participated in a cover-up relating to this grossly excessive use of force.

52.     Thus, Officer Dulayev falsely reported the circumstances surrounding the tasing, stating:

> I told the suspect to crawl out to me on his hands and knees; however he jumped up and started coming towards me. Once the suspect was out of the bushes he was still walking towards me, I told him to stop and put his hands up, but he kept advancing. I took a couple of steps back as I told the suspect to stop one more time. The suspect did not comply with my orders and advance towards me, at that time I deployed my Tazer, striking the suspect in his chest area.

53.     Officer Enriquez also participated in this cover up, falsely stating:

> The officers attempted to detain the defendant but he refused officers orders to get on the ground. Instead he advanced towards officers in an aggressive manner and was tased in order to stop him. While on the ground, the defendant was resisting

8

officers and would not put his hands behind his back after officers ordered him numerous times to stop resisting and put hi[s] hands behind his back.

54.     Despite video evidence to the contrary, Investigating Supervisor Sgt. J. Maher also acted to cover-up and ratify this excessive use of force.

55.     Thus, on June 3, 2016, the same day as this incident, Sgt. J. Maher issued a Supervisor's Use of Force Report.

56.      Sergeant Maher also falsely reported that: "As Heard exited he was still active [sic] aggressive and did not comply with Officer Dulayev's commands to stop advancing on him. Officer Dulayev had to take several steps back to avoid being potentially assaulted by Heard. Heard did not stop walking towards Officer Dulayev at which time he deployed his Taser at the front of the suspect."

57.     Officer Dulayev did not take several steps back to avoid an assault.

58.     Yet Sgt. Maher falsely claimed that the officers body worn camera footage on scene "were consistent with the videos."

### Denver Failed to Discipline Officer Dulayev in This Case and Found That He Acted in Accordance with His Training

59.     In his Supervisor's Use of Force Report, Sgt. Maher determined that Officer Dulayev's use of force in this case was within Denver policy.

60.     Sgt. Maher concluded his report by stating: "The force used against Heard was appropriate due to his level of aggression. The less lethal system incapacitated Heard quickly and prevented further injuries to both the suspect and officers. The force was both reasonable and necessary as well as within department policy regarding the use of force."

61.     The Command Officer also signed off on this Supervisor Use of Force Report, further approving Officer Dulayev's use of force against Mr. Heard.

62.     Denver determined this despite the video evidence contradicting both of these officers' accounts.

63.     The Internal Affairs Bureau (IAB) investigated this incident and continued to misrepresent or mischaracterize the video footage and statements of Mr. Heard and officers with respect to his arrest and tasing.

64.     Notably, IAB reported that Officer Enriquez interviewed "an unknown male who claimed to be video recording the arrest of Greg Heard on a cell phone" but "did not obtain this unknown witness's information."

65.     Thus, contrary to well-established police practices, officers did not obtain a statement from this unbiased eyewitness to these events who apparently had additional video footage of the incident in question. They did not even obtain his information so this witness could be located and interviewed at a later time.

66.     Nevertheless, Denver, through IAB and command staff, continued to ratify this unconstitutional use of force, showing its deliberately indifferent customs, training and supervision, by completely exonerating him with respect to the use of force and all of his actions connected to Mr. Heard.

67.     The Conduct Review Office of DPD specifically concluded that: "Officer Dulayev's actions were within the policies, procedures, rules, regulations and directives of the Department."

68.     In stark contrast, Michael Berry, a retired police officer who currently trains Colorado law enforcement officers, strongly criticized the use of force against Mr. Heard.

69.     Mr. Berry told the news media that Officer Heard's first mistake was using profanity and threatening Mr. Heard upon arriving on scene, stating: "The officer is already amped up, because he's already using curse words. He says 'I'll fucking tase you' and that's uncalled for. He's heightening the situation, showing that he's out of control – that he's agitated and aggressive in his verbal response."

70.     Mr. Berry, who has seventeen years experience in law enforcement, further explained why the tasing was excessive, stating:

> But this guy [Heard] wasn't trying to fight the officer, he wasn't arguing with the officer. His facial expression, his body movement, didn't display any pre-assaultive indicators. He was getting his balance, coming out of a leaned position, and even if he wasn't tripping outright, he wasn't on solid footing. And he's a big man. It looks like he's just trying to stand straight up, and he's talking while he's walking, kind of trying to explain himself – like 'I didn't start it' or something like that. So he's doing a lot of things – he's multi-tasking and trying to process all of this information. But the officer didn't give him time to process it.

> His arms are at his sides, he's unarmed, his chest isn't expanded, his shoulders aren't back, his eyebrows aren't in a frowning position. He doesn't curse the officer. He's giving all of these cues that he doesn't want conflict. And then, when he gets tased, you can see by the way his body and face react that he's like 'What the hell just happened?' If you'd have shot him with a gun, he wouldn't have been more surprised.

**Denver's Custom, Practice, and Policy of Excessive Force & Unlawful Seizures**

71.     Plaintiff's injury at the hands of Denver law enforcement officers is yet another example of the overwhelmingly common use of excessive force by Denver law enforcement throughout the past months and years that has been tolerated by Denver.

11

72.     Denver's failure to train and discipline Officer Dulayev with respect to this use of force is indicative of a broader pattern in the Denver Police Department.

73.     Mr. Heard's case is yet another example of the customs, habits and practices by the Denver Police Department that condones excessive force as well as officers giving false reports to investigators in an official records that cover up their abuses of power – a practice that continues to be tolerated by the Department and City of Denver. Here, as with many other cases, Denver determined that Officer Dulayev's use of force was essentially textbook and on point, when in reality, it was not in compliance with modern and well-established police training.

74.     The City of Denver has created, fostered, and tolerated an environment and culture of law enforcement brutality and deliberate indifference to the constitutional rights of citizens and residents.

75.     Denver law enforcement officers have engaged in a persistent practice of law enforcement misconduct, and the officials responsible for assuring that such misconduct does not occur have consistently failed to properly train, supervise, and discipline individual officers who have engaged in such misconduct.

76.     In *Ortega, et al. v. City and County of Denver, et al.*, 944 F. Supp. 2d 1033 (D. Colo. 2013), the U.S. District Court for the District of Colorado found that the four plaintiffs in that case had met their burden to survive summary judgment on municipal liability as to their claims of excessive force based on three separate theories: (1) Denver's inadequate training of DPD Officers on use of force, (2) Denver's failure to adequately investigate complaints of DPD Officers' excessive force and discipline officers who used excessive force, and (3) Denver's custom of tolerating DPD Officers' "code of silence" with respect to uses of force.

77.     This finding was based on plentiful evidence presented in that case, including the

following:

> a)      Testimony by Denver's former Manager of Safety, Charlie Garcia, that he believed DPD Officers had used "heavy-handed tactics" since 1993 and that these tactics were a result of the DPD's training policy.
>
> b)      Testimony by Denver's former Independent Monitor, Richard Rosenthal, that Denver had a "systemic problem" of officers not being held accountable for their uses of force.
>
> c)      Evidence of numerous specific instances in which DPD IAB failed to adequately investigate a citizen complaint of excessive force and the implicated officer was not disciplined.
>
> d)      Testimony by former Manager of Safety Garcia that he had observed a pattern of failure to report uses of force.

78.     Following the *Ortega* matter, then-Denver Manager of Safety Alex Martinez

publicly criticized the disciplinary process for DPD officers.  In November 2012, following the

Civil Service Commission's upholding of the termination of an officer after many overturned

terminations, he stated:  "That's a positive outcome, but it took a year-and-a-half to get there.

It's a sign of a system that didn't work well. Yeah, it's going to spit out results in our favor

sometimes. And so I'm pleased to have the success, but it's merely an illustration for the need

for reform."  He called for the reform of the Civil Service Commission.[2]

79.     The evidence presented in the *Ortega* matter is applicable to the present situation,

where, as described above, Officer Dulayev received inadequate training, supervision, and

discipline with regard to use of force.

---

[2] Levin, Sam.  *Alex Martinez, Manager of Safety, Wants Civil Service Commission Reform Despite Latest Ruling.* Westword (Nov. 1, 2012), available at http://www.westword.com/news/alex-martinez-manager-of-safety-wants-civil-service-commission-reform-despite-latest-ruling-5863093.

80.     This culture and environment of brutality and the lack of training, supervision, and discipline of law enforcement officers is further evidenced by, among other things, the sheer volume of lawsuits filed against and/or legal settlements with Denver law enforcement alleging excessive force, the involvement of dozens of different law enforcement officials in those lawsuits, and the repeated involvement of the same officers in multiple lawsuits. For length and notice pleading rules required of Complaints, Plaintiff does not list the many examples of the rampant use of excessive force (including deadly force) by Denver law enforcement officers over the years, which demonstrates the lack of any training or supervision on the part of the City and County of Denver to prevent this unconstitutional conduct.[3]

81.     Thus, courts frequently hold that Denver has a pattern and practice of failing to train and supervise its officers in the use of excessive force. *See e.g. Schreiber v. City and County of Denver et al,* No. 16-cv-00203-LTB-MEH, Doc. #30 (Recommendation denying Denver's motion to dismiss, which was approved by the District Judge) ("the Court is not persuaded by Defendants' arguments that the purported actions taken (or not taken) by Defendant Denver cannot rise to the level of municipal liability based on custom. Plaintiff effectively pleads that Defendant Denver's ongoing track record of failing to investigate, discipline, train, and supervise its officers with respect to use of force could plausibly demonstrate a custom or pattern of practice.")

---

[3] Without reprinting the laundry lists of prior cases, for example, those identified in the complaints in *Booker v. Denver*, Civil Action No. 11-cv-000645-WYD-KMT, Doc. #36 and *Ronquillo v. Denver*, Civil Action No. 16-cv-1664- KMT, Doc. #1, (both incorporated by this reference), it is also sufficient to recognize that in December 2014, North Denver News examined the list of hundreds of cases within the last decade and found that Denver has the second highest, per capita, rate of death caused by law enforcement in the country. *See* North Denver News article titled: Denver has the second highest rate of death from law enforcement in the country. https://northdenvernews.com/denver-secondhighest-rate-death-law-enforcement-country/.

14

82.     These widespread failures committed by Denver resulted in Officer Dulayev's violent assault on Mr. Heard.

83.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered actual physical and emotional injuries, and other damages and losses as described herein, entitling him to compensatory and special damages, in amounts to be determined at trial.

84.     Plaintiff continues to suffer ongoing emotional distress, including severe distrust of police and society, as a result of the unreasonable excess force employed during his seizure.

85.     Plaintiff is also entitled to punitive damages against Officer Dulayev to redress his willful, malicious, wanton, reckless conduct and attempted cover-up of this civil rights violation.

## V.  CLAIMS FOR RELIEF
### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983 – Excessive Force in violation of the Fourth Amendment**
(Plaintiff against Defendant Officer Dulayev)

86.      Plaintiff hereby incorporates all of the forgoing paragraphs of this Complaint as if fully set forth herein.

87.     42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

88.     Plaintiff is a citizen of the United States and the individual police officer Defendant is a person for purposes of 42 U.S.C. § 1983.

89.     Defendant, at all times relevant hereto, was acting under the color of state law in his capacity as a Denver police officer, and his acts or omissions were conducted within the scope of his official duties or employment.

90.     At the time of the complained of events, Plaintiff had a clearly established constitutional right under the Fourth Amendment to be secure in his person from unreasonable seizure through excessive force by law enforcement.

91.     Any reasonable police officer knew or should have known of this right at the time of the complained of conduct as it was clearly established at that time.

92.     Officer Dulayev engaged in the use of force that was objectively unreasonable in light of the facts and circumstances confronting him, violating Mr. Heard's Fourth Amendment right to be free from excessive force.

93.     It was not objectively reasonable to tase and shove an unarmed Mr. Heard to the ground as he was complying with the Officer's commands to come out from behind the bushes, showing his hands in a surrendering position, in no way attempting to escape or flee, and not posing a threat to the physical safety of the officer or others.

94.     Officer Dulayev engaged in the acts and omissions described herein pursuant to the custom, policy, and practice of Denver, which encourages, condones, tolerates, and ratifies the use of excessive force and deprivation of constitutionally protected interests by law enforcement officers.

95.     The acts or omissions of Defendant were the legal and proximate cause of Plaintiff's damages.

96.     As a proximate cause and result of Defendants' unlawful conduct, Plaintiff has suffered actual physical bodily and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, great pain and emotional distress.

97.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

98.     In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against Defendant, in that his actions were taken maliciously, willfully or with a reckless or wanton disregard of the constitutional rights of Plaintiff.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Failure to Train and Supervise**
(Against the City and County of Denver)

99.      Plaintiff hereby incorporates the forgoing paragraphs of this Complaint as if fully set forth herein.

100.     Denver failed to properly train, supervise, and discipline its employees, including Officer Dulayev, with respect to the use of excessive force.

101.     Denver's failure to, in its supervisory duties, adequately train, supervise, and discipline its officers with respect to the use of excessive force is a custom, policy, or practice of Denver and a moving force behind the constitutional violations described herein.

102.     Denver has a culture of tolerating excessive force by its law enforcement officers.

17

103.    The constitutional violations against and harming of Plaintiff was a foreseeable consequence of Denver's actions and inactions.

104.    Denver was deliberately indifferent to the constitutional rights of its citizens by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force. Denver could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

105.    Denver's policies, customs, and/or practices in failing to properly monitor, train, supervise and discipline its employees were the moving force and proximate cause of the violation of Plaintiff's constitutional rights.

106.    The acts or omissions of Denver caused Plaintiff damages in that he suffered extreme physical and mental pain during and after the assault.

107.    The actions or omissions of Denver as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

## VI.  PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each of the Defendants, and award him all relief allowed by law, including but not limited to the following:

A.    Compensatory and consequential damages, including damages for physical injuries, emotional distress including but not limited to upset, anger, flashbacks, loss of trust, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

B.      Special damages including for all past and future health and medical/psychological care charges in an amount to be determined at trial including sums to satisfy any lien interests;

C.      Punitive damages against individual Defendant in amounts to be determined at trial;

D.      Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988;

E.      Pre- and post-judgment interest at the lawful rate;

F.      Any further relief that this court deems just and proper, and any other appropriate relief at law or in equity.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this 10th day of August, 2017.

> */s/ Erica T. Grossman*
> Erica T. Grossman
> John R. Holland
> Anna Holland Edwards
> Dan Weiss
> Holland, Holland Edwards & Grossman, PC
> 1437 High Street
> Denver, CO 80218