**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Robert E. Blackburn**

Civil Action No. 17-cv-1936-REB-SKC

GREGORY HEARD

      Plaintiff,

v.

GREG DULAYEV, individually,
CITY AND COUNTY OF DENVER, a municipality,

      Defendants.

---

## ORDER DENYING MOTION TO DISMISS

---

**Blackburn, J.**

      This matter is before me on the **Defendants' Motion To Dismiss Complaint**

[#11][1] filed October 23, 2017.  The plaintiff filed a response [#20], and the defendants

filed a reply [#21].  I deny the motion.

## I.  JURISDICTION

      I have subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).

## II.  STANDARD OF REVIEW

      When ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I must

determine whether the allegations of the complaint are sufficient to state a claim within

the meaning of Fed. R. Civ. P. 8(a).  For many years, "courts followed the axiom that

dismissal is only appropriate where 'it appears beyond doubt that the plaintiff can prove

---

[1]  "[#11]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

no set of facts in support of his claim which would entitle him to relief.'" *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).  Noting that this standard "has been questioned, criticized, and explained away long enough," the Supreme Court of the United States overruled and supplanted it in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562 (2007).

Under the dictates of *Twombly*, I now review the complaint to determine whether it "'contains enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombly*, 127 S.Ct. at 1974).  "This pleading requirement serves two purposes:  to ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense, and to avoid ginning up the costly machinery associated with our civil discovery regime on the basis of a largely groundless claim." *Kansas Penn Gaming*, 656 F.3d at 1215 (citation and internal quotation marks omitted).

As previously, I must accept all well-pleaded factual allegations of the complaint as true. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 997 (10th Cir. 2002). Contrastingly, mere "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not be sufficient to defeat a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted). *See also Robbins v. Oklahoma*, 519 F.3d 1242, 1247-48 (10th Cir. 2008) ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also

2

'grounds' on which the claim rests.") (quoting *Twombly*, 550 U.S. at 555 n. 3) (citations omitted).  Moreover, to meet the plausibility standard, the complaint must suggest "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.  *See also Ridge at Red Hawk*, 493 F.3d at 1177 ("[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.") (emphases in original).  For this reason, the complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Kansas Penn Gaming*, 656 F.3d at 1214 (quoting *Twombly*, 550 U.S. at 555).  The standard will not be met where the allegations of the complaint are "so general that they encompass a wide swath of conduct, much of it innocent." *Robbins*, 519 F.3d at 1248.  Instead "[t]he allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Id.*

The nature and specificity of the allegations required to state a plausible claim will vary based on context and will "require[] the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *see also Kansas Penn Gaming*, 656 F.3d at 1215.  Nevertheless, the standard remains a liberal one, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556)(internal quotation omitted).

## III.  FACTS

This description of the facts is based on the allegations in the complaint [#1], which for now must be presumed to be true.[2]  Exhibit 1 to the complaint is a video of the incident in question.  The video was captured from the body worn camera of a police officer.  The video is part of the allegations of the complaint.  Thus, I include the video in my analysis of the allegations in the complaint.[3]

On June 3, 2016, the plaintiff, Gregory Heard, and another man got into a fight behind some bushes at 1950 North Clarkson Street in Denver.  ¶ 12.  Denver Police Officers Greg Dulayev and Adrian Enriquez responded to the scene.  When the officers arrived, the other man involved in the fight "had already come out from behind the bushes as he was instructed to do by Officer Enriquez." ¶ 17.  However, Mr. Heard remained behind the bushes and next to a fence.  Officer Dulayev's interaction with Mr. Heard was captured on video from his body worn camera.  ¶ 14.[4]

Officer Dulayev approached the bushes and ordered Mr. Heard to put his "hands up!" [#1-2] at 00:30:00 – 00:31:00.  Mr. Heard was in a seated position behind the bushes.  He stated that his hands were up and he waved his empty hands out from behind the bushes where they could be seen by Officer Dulayev. [#1-2] at 00:31:00 - 00:33:00.  Mr. Heard had nothing in his hands.  Officer Dulayev, who had his taser drawn, ordered Mr. Heard to "Crawl out. Crawl out on your hands and knees or I'll

---

[2]  In this order I cite particular paragraphs in the complaint by their paragraph number, e.g. ¶ 1.

[3]  I view the video with the understanding that a video rarely, if ever, contains all of the relevant information about an event.

[4]  I cite the video by its docket number [#1-2] with reference to portions of the video as specified by the digital time clock indicated on the video, e.g. 00:30:00 - 00:31:00.

f—king tase you." [#1-2] at 00:00:34:00 to 00:00:37:00.  Mr. Heard responded "Don't tase me, man."  ¶ 27.

When Mr. Heard began to emerge from behind the bushes, he was on his hands and knees.  [#1-2] at 00:35:00 to 00:36:00.   As he emerged, Mr. Heard rose to his feet. [#1-2] at 00:36:00 to 00:37:00.  Mr. Heard then took about three steps in the direction of Officer Dulayev.  [#1-2] at 00:37:00 to 00:39:00.  As Mr. Heard began to take these steps, Officer Dulayev said "Turn around!" and "Stop right there! Stop!."  [#1-2] 00:38:00 - 00:39:00.  As Officer Dulayev made these commands, Mr. Heard continued taking his few steps out from the bushes in the direction of Officer Dulayev.  *Id*.  Officer Dulayev deployed his Taser and it struck Mr. Heard in the abdomen. [#1-2] 00:40:00.

Mr. Heard collapsed to his knees in pain.  ¶ 32.  Officer Dulayev then jumped on Mr. Heard and aggressively shoved his face into the dirt.  ¶ 33.  Mr. Heard was disabled on the ground from having been tased.  ¶ 34.  While placing Mr. Heard in handcuffs, Office Dulayev and another other officer repeatedly and falsely accused Mr. Heard of resisting, even though Mr. Heard was disabled on the ground. ¶ 34.  Mr Heard was not resisting, but was trying to breathe while writhing on the ground in pain.  ¶ 36.

Mr. Heard was never given a reasonable opportunity to surrender peacefully and comply with Officer Dulayev's bang-bang commands.  ¶ 40.  At no time did Mr. Heard appear agitated or aggressive toward Officer Dulayev.  ¶ 42.  At no time did Mr. Heard demonstrate any sort of physical resistance or try to escape from Officer Dulayev.  ¶ 43. The facial expression and body movements of Mr. Heard were non-threatening.  ¶ 44.

His arms were at his sides and his body language clearly indicated he was in no way trying to fight or attack the police officers.[5]   ¶ 45.

## IV.  QUALIFIED IMMUNITY

Officer Dulayev asserts the defense of qualified immunity.  A state official is immune from civil liability unless his actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Herring v. Keenan*, 218 F.3d 1171, 1175 (10th Cir. 2000), *cert. denied*, 122 S.Ct. 96 (2001).  To overcome this immunity, a plaintiff must establish: (1) that defendant violated the plaintiff's rights under federal law; and (2) that such rights were clearly established at the time of the violation.  *Greene v. Barrett*, 174 F.3d 1136, 1142 (10th Cir. 1999).  A reviewing court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  *See also Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009).

"Qualified immunity balances two important interests--the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  The Supreme Court of the United States has repeatedly highlighted the broad protection that this defense provides.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009).  The Court has stressed

---

[5]  Viewing the video in the light most favorable to Mr. Heard, the video can be seen as consistent with the allegations in ¶¶ 42 - 45 of the complaint.

that qualified immunity protects officials from having to stand trial and from having to bear the burdens of litigation, including pretrial discovery. *Id*.

A defendant asserting the defense of qualified immunity may challenge a complaint in a motion to dismiss. Such a challenge asserts that, taking the allegations in the complaint as true, the plaintiff does not allege facts which establish a violation of the plaintiff's rights under federal law and/or that the right allegedly violated was not clearly established at the time of the alleged violation. This is the tenor of the motion to dismiss of Officer Dulayev. A plaintiff may counter a qualified-immunity defense raised in a motion to dismiss by resting on the facts alleged in the pleadings. The court must view the allegations in the complaint in the light most favorable to the plaintiff. *Lowe v. Raemisch*, 864 F.3d 1205, 1207-1208 (10th Cir. 2017).

### A.  Alleged Violation of Constitutional Rights

#### 1.  Fourth Amendment Seizure

Mr. Heard alleges Officer Dulayev violated the Fourth Amendment rights of Mr. Heard because Officer Dulayev used excessive force against Mr. Heard. Mr. Heard alleges Officer Dulayev used excessive force when he (1) used a taser against Mr. Heard; and (2) when he subsequently jumped on Mr. Heard "and aggressively shoved his face into the dirt." ¶ 33.

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. *Graham*, 490 U.S. at 394. Use of a Taser unquestionably seizes the person tased "in an abrupt and violent manner." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010). Use of a taser constitutes a severe intrusion on the interests protected by the Fourth

7

Amendment. *Id*.  Similarly, an arrest is a seizure.  ***Terry v. Ohio***, 392 U.S. 1, 16 (1968) ("whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person").

In the context of an arrest, "(e)xcessive force claims are governed by the Fourth Amendment's objective reasonableness standard."  ***Cavanaugh***, 625 F.3d at 664 (internal quotation omitted).  Under this standard, courts must careful[ly] balance . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  ***Graham***, 490 U.S. at 396. "[T]he question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation."  ***Graham v. Connor***, 490 U.S. 386, 397 (1989) (internal quotation omitted).

Application of this standard to a particular situations requires "careful attention to the facts and circumstances of each particular case . . . ."  *Id*. at 396.  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id*. (citation and internal quotation omitted).  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Id*. (internal quotation and citation omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396 - 397.

In *Graham*, the Court noted three important factors which must be considered in assessing use of force by a police officer: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to flee. *Id*. at 396. Applying the *Graham* factors, Officer Dulayev contends in his motion to dismiss that the allegations in the complaint, including the video, do not state a claim for violation of the Fourth Amendment based on the use of force by Officer Dulayev.

2.  Application of *Graham* Factors

Assuming the allegations in the complaint (and concomitant video) to be true, I find and conclude that the *Graham* factors apply in this case as detailed below.

(a) <u>Severity of the Crime At Issue</u> - Applying the first *Graham* factor, Mr. Heard alleges in the complaint that he had been in a fight with another man.  ¶ 12.  Officer Dulayev and another officer responded to a call reporting this incident.  ¶ 13.  Officer Dulayev says the severity of the assault which may have been committed by Mr. Heard was not known to Officer Dulayev when he arrived on the scene.  In this circumstance, Officer Dulayev notes, he reasonably approached Mr. Heard as an individual who may have committed a serious assault.

Suspicion of an assault weighs at least slightly in favor of a finding that the use of force by Officer Dulayev was objectively reasonable.  *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012).  However, this factor must be considered in combination with the other factors and all other relevant circumstances.

(b) <u>Whether the Suspect Poses an Immediate Threat to the Safety of the Officers or Others</u> - Addressing the second *Graham* factor, Mr. Heard notes that the

allegations in the complaint, including the video, show that at no point did Mr. Heard resist, attempt to flee, or threaten Officer Dulayev or others.   Officer Dulayev says he was confronted with an assault suspect who was walking toward the officer even though the suspect had been commanded to stay on his hands and knees, to turn around, and to stop.   These circumstances, plus the fact that the suspect closed the distance between the suspect and the officer in a very short time, Officer Dulayev says, made his use of force reasonable because of the possible threat presented by Mr. Heard.

Officer Dulayev observes that the video shows Officer Dulayev giving three sets of commands to Mr. Heard in the span of ten seconds.   Mr. Heard disobeyed two of these commands.   Mr. Heard obeyed the command "hands up" by raising his hands and waving them out from behind the bushes where they could be seen by Officer Dulayev.   Mr. Heard had nothing in his hands.   Officer Dulayev, who had his Taser drawn, then ordered Mr. Heard to "Crawl out. Crawl out on your hands and knees or I'll f—king Tase you."   When Mr. Heard began to emerge from behind the bushes, he was on his hands and knees.   As he emerged, Mr. Heard rose to his feet.   At this point, he disobeyed the command to crawl out on his hands and knees.   Mr. Heard then began to take a few steps toward Officer Dulayev.   Over the course of about one second, Officer Dulayev said "Turn around!" and "Stop right there! Stop!"  [#1-2] 00:38:00 - 00:39:00.   In this one second, Mr. Heard did not turn around or stop. Rather, he continued to step away from the bushes and toward Officer Dulayev.

Officer Dulayev says Mr. Heard, after he rose to his feet, covered the distance between the bush and Officer Dulayev in less than three seconds.   *Reply* [#21], p. 7.

From the beginning, the two men were close to each other.  Mr. Heard did step closer to Officer Dulayev but the video does not show Mr. Heard running or rushing at Officer Dulayev. Mr. Heard alleges, and the video reasonably can be seen to show, that Mr. Heard was not acting in a manner that was threatening as he stepped away from the bushes.  He was not saying anything that was threatening.  Before the taser was deployed by Officer Dulayev, Mr. Heard had one to two seconds to hear, process, and respond to the commands "Turn around!" and "Stop right there! Stop!"

In the complaint [#1], Mr. Heard notes the analysis of Michael Berry, a retired police officer who currently trains Colorado law enforcement officers.  ¶¶ 68-70.  Mr. Barry notes several aspects of the behavior of Mr. Heard as important factors which indicated Mr. Heard was not a serious threat to Officer Dulayev before the taser was deployed against Mr. Heard.

> His facial expression, his body movement, didn't display any pre-assaultive indicators.
>
>       *   *   *   *
>
> [He] wasn't trying to fight the officer, he wasn't arguing with the officer. His facial expression, his body movement, didn't display any preassaultive indicators.  His arms are at his sides, he's unarmed, his chest isn't expanded, his shoulders aren't back, his eyebrows aren't in a frowning position. He doesn't curse the officer. He's giving all of these cues that he doesn't want conflict.
>
>       *   *   *   *
>
> (H)e's multi-tasking and trying to process all of this information. But the officer didn't give him time to process it.

¶ 70.  The conclusions of Mr. Berry are subject to debate.  In the context of the complaint, including the video, the conclusions of Mr. Berry are plausible and reasonable.  As allegations in the complaint, and addressing a motion to dismiss, I must accept these allegations containing the opinions of Mr. Berry as true.

In the video, after Mr. Heard is on the ground and the officers, including Officer Dulayev, are applying handcuffs, the officers yell "stop resisting!"  Mr. Heard alleges in the complaint that the officers "falsely accused him of resisting."  ¶ 34.  Mr. Heard alleges he "was not resisting but simply trying to breathe, while writhing on the ground in pain."  ¶ 35.  The complaint, including the video, includes plausible allegations that Mr. Heard did not resist after he was on the ground. The complaint, including the video, contains no indication that Mr. Heard verbally threatened Officer Dulayev or that Mr. Heard attempted to flee after he was on the ground.

Accepting the allegations in the complaint, including the video, as true, the second *Graham* factor weighs against a finding that the use of force by Officer Dulayev was objectively reasonable.  From this perspective, Mr. Heard did not present an immediate threat to Officer Dulayev or to others.

(c) <u>Whether the Suspect Is Actively Resisting Arrest or Attempting to Flee</u> - The complaint, including the video, includes plausible allegations that Mr. Heard was not actively resisting arrest or attempting to flee before the taser was deployed.  In the video, the police officers say "stop resisting" as they try to handcuff Mr. Heard. However, Mr. Heard alleges plausibly that he was not resisting after he was on the ground and the officers were applying handcuffs.  This factor weighs against a finding that the use of force by Officer Dulayev was objectively reasonable.

3.  Conclusion

Accepting the allegations in the complaint, including the video, as true, the first *Graham* factor weighs slightly in favor of a finding that the use of force by Officer Dulayev was objectively reasonable.  The second and third *Graham* factors weigh

12

against a finding that the use of force by Officer Dulayev was objectively reasonable. Thus, on balance I conclude that the allegations in the complaint are sufficient to state a valid Fourth Amendment claim against Officer Dulayev.

### B. Violation of Clearly Established Law

In a police excessive force case, denial of qualified immunity is appropriate only if the officer violated law that was "clearly established" at the time of his or her conduct. *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)). The question of whether a right is clearly established must be answered "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Klen v. City of Loveland, Colo.*, 661 F.3d 498, 511 (10th Cir. 2011) (internal quotation and citation omitted). "[P]recedent is considered on point if it involves *materially similar conduct* or applies *with obvious clarity* to the conduct at issue." *Lowe v. Raemisch*, 864 F.3d 1205, 1208 (10th Cir. 2017) (internal quotation and citations omitted). The question is not whether the general right to be free from excessive force is clearly established, but whether the plaintiff had a clearly established right under the particular facts of this case. *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012). "[T]he fact that it is clear that any

13

unreasonable use of force is unconstitutional does not mean that it is always clear *which* uses of force are unreasonable." ***Casey v. City of Federal Heights***, 509 F.3d 1278, 1284 (10th Cir. 2007).

A determination of whether excessive force was used is a fact-specific inquiry. Thus, "there will almost never be a previously published opinion involving exactly the same circumstances." ***Casey***, 509 F.3d at 1284. "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." ***Hope v. Pelzer***, 536 U.S. 730, 741 (2002). In the context of excessive force claims, the Tenth Circuit has adopted a sliding scale in determining clearly established law.

> The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. In fact, we do not always require case law on point. When an officer's violation of the Fourth Amendment is particularly clear from ***Graham*** itself, we do not require a second decision with greater specificity to clearly establish the law.

***Morris***, 672 F.3d at 1196–97.

Mr. Heard cites Tenth Circuit cases in which the court found the use of a taser to be excessive under the Fourth Amendment. ***Morris v. Noe***, 672 F.3d 1185, 1196 (10th Cir. 2012); ***Cavanaugh v. Woods Cross City***, 625 F.3d 661 (10th Cir. 2010); ***Casey v. City of Federal Heights***, 509 F.3d 1278 (10th Cir. 2007). Officer Dulayev contends these cases are too different from the present case to provide clearly established law in the context of qualified immunity. This is true, Officer Dulayev asserts, because these cases did not involve a suspect who had disobeyed orders and who was moving toward the officer. In addition, these cases involve use of a taser without warning to the suspect.

Officer Dulayev cites **Hinton v. City of Elwood**, 997 F.2d 774 (10th Cir. 1993) and **Wilson v. City of Lafayette** , 510 Fed. Appx. 775 (10th Cir. 2013) as the relevant case law.  In **Hinton**, the court found an officer did not violate the Fourth Amendment when he deployed a Taser on a subject who refused to talk to police after being requested to stop, then shoved an officer, and physically and actively resisted when officers wrestled him to the ground.  This case does little to inform the qualified immunity analysis in the present case.  Unlike **Hinton**, Mr. Heard did not refuse to speak to police, he did not shove an officer, and, relying on the allegations in the complaint, he did not actively resist when he was on the ground.

**Wilson** also differs substantially from the present case.[6]  The suspect in **Wilson** was fleeing from police, refused to obey several orders to stop, and refused to obey several orders to keep his hand away from his pocket.  **Wilson**, 510 Fed. Appx. at 776. Just before being tased, the suspect continued his flight and again reached for his pocket.  **Id**. at 779.  At that point, the officer reasonably could fear that "he faced imminent danger from a lethal weapon."  **Id**.  The court found that use of a taser was not clearly excessive in light of the officer's "legitimate self-defense interest."  **Id**.

No surprise, no case cited by any party is factually identical to the present case. However, the published cases, considered as a whole, involve conduct materially similar to the conduct at issue here.  Those cases, considered as a whole, establish that use of a taser against a suspect constitutes excessive force when the suspect is

---

[6]  **Wilson** is an unpublished opinion.  "An unpublished opinion ... provides little support for the notion that the law is clearly established on [a] point."  **Mecham v. Frazier**, 500 F.3d 1200, 1206 (10th Cir. 2007).  However, an unpublished opinion can be quite relevant in showing that the law was not clearly established.  **Grissom v. Roberts**, 2018 WL 4102891, at *2 (10th Cir. 2018).

15

not armed, does not appear to be reaching for a weapon, is not fleeing, has made no verbal threats, has not made physical movements that reasonably can been seen as threatening, and has not made other movements or gestures that reasonably can be seen as threatening.  In these circumstances, the fact that the suspect has disobeyed some orders of the officer does not, by itself, justify a potent use of physical force, such as a taser.  A consideration of *Graham* together with the Tenth Circuit cases cited above establishes this proposition as a matter of clearly established law.

## C.  Conclusion

Taking the allegations of the complaint as true, and viewing those allegations in the light most favorable to Mr. Heard, he has stated a claim for violation of his rights under the Fourth Amendment based on the use of force of Officer Dulayev.  *Graham* and the published Tenth Circuit decisions concerning police excessive force, particularly the use of a taser, when viewed as a whole, involve conduct that is materially similar to the conduct at issue here.  Those cases, considered as a whole, establish that use of a taser against a suspect constitutes excessive force when the suspect is not armed, does not appear to be reaching for a weapon, is not fleeing, has made no verbal threats, has not made physical movements that reasonably can been seen as threatening, and has not made other movements or gestures that reasonably can be seen as threatening.  In these circumstances, the fact that the suspect has disobeyed some orders of the officer does not, by itself, justify a potent use of physical force, such as a taser, *a fortiori*, when there exists a real dispute about whether the rapidity of the orders gave the suspect a reasonable time to hear, process, and respond.

## V.  MUNICIPAL LIABILITY

The Second Claim for Relief of Mr. Heard is a claim against the City and County of Denver for failure to train and supervise.  *Complaint* [#1], p. 17.  The detailed factual allegations in support of this claim are found in the complaint at ¶¶ 71-85.  A municipality may be liable for the violation of the constitutional rights of an individual if the individual shows (1) the existence of a municipal policy or custom; (2) with deliberate indifference to an almost inevitable constitutional injury; and (3) the policy or custom is the moving force behind the injury; the cause of the injury.  ***Schneider v. City of Grand Junction Police Dept.***, 717 F.3d 760, 769–70 (10th Cir. 2013).

Mr. Heard alleges Denver "failed to properly train, supervise, and discipline its employees, including Officer Dulayev, with respect to the use of excessive force." ¶ 100.  This failure, Mr. Heard alleges, is a "custom, policy, or practice of Denver and a moving force behind the constitutional violations described herein."  ¶ 101.  He alleges "Denver was deliberately indifferent to the constitutional rights of its citizens by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force."  ¶ 104.  He alleges that these failures "were the moving force and proximate cause" of the alleged violation of the rights of Mr. Heard.  ¶ 105.

 Denver contends Mr. Heard has not adequately alleged the existence of a municipal policy or custom of failure to train police officers adequately concerning use of force.  In summary fashion, Mr. Heard cites findings in other lawsuits concerning training in use of force by Denver law enforcement and comments by Denver law enforcement officials concerning widespread problems with use of excessive force by Denver Police officers. ¶¶ 75- 81.  According to Mr. Heard, these many prior incidents

constitute an "overwhelmingly common use of excessive force by Denver law enforcement throughout the past months and years . . . ." ¶ 71.  This common use of excessive force, he alleges, has been tolerated by Denver.  ¶¶ 71, 102.  These allegations are sufficiently specific to allege the existence of a municipal policy or custom of failure train, supervise, and discipline its law enforcement employees concerning use of excessive force.[7]

Denver contends Mr. Heard has not alleged adequately that Denver was deliberately indifferent to an almost inevitable constitutional injury.  "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).  If Denver was on notice of repeated problems with its law officers using excessive force and the training and supervision provided by the city did not adequately address the proper use of force by law enforcement, then it can be argued that Denver was deliberately indifferent to this issue.   I find and conclude the allegations in the complaint are sufficiently specific to allege that Denver was aware of a chronic problem of use of excessive force by its law enforcement officers and Denver was deliberately indifferent to this problem when it failed to adjust its training and supervision to address this issue.

---

[7]  The defendant also contends the allegations in the complaint are not sufficient to establish a policy or custom based on a ratification theory.  I do not address this contention because, in pleading his Second Claim for Relief, Mr. Heard does not allege a ratification theory.  ¶¶ 99-107.

Denver contends Mr. Heard provides only conclusory allegations of causation.  In the context of the other allegations in the complaint, the allegations of Mr. Heard that the "widespread failures committed by Denver resulted in Officer Dulayev's violent assault on Mr. Heard" are sufficient to allege causation.  These allegations are sufficient to "raise a right to relief" on the issue of causation "above the speculative level." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011).

In sum, concerning the Second Claim for Relief against Denver, the allegations in the complaint  "contain[ ] 'enough facts to state a claim to relief that is plausible on its face.'"  *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  To the extent greater detail and evidence is necessary to resolve the validity of this claim, discovery, a motion for summary judgment, and, if necessary, a trial will permit the development of these details.

## VI.  CONCLUSION

Taking the allegations of the complaint as true, and viewing those allegations in the light most favorable to Mr. Heard, he has stated a claim for violation of his rights under the Fourth Amendment based on the use of force of Officer Dulayev.  Taking the allegations of the complaint as true, and viewing those allegations in the light most favorable to Mr. Heard, *Graham* and the published Tenth Circuit decisions concerning police excessive force, particularly the use of a taser, when viewed as a whole, involve conduct that is materially similar to the conduct at issue here.  Those cases, considered as a whole, establish that use of a taser against Mr. Heard was a violation of clearly established law.  Additionally, the allegations in the complaint contain enough facts to

state a claim that is plausible on its face against the City and County of Denver.  Thus,

the motion to dismiss should be denied.

**THEREFORE, IT IS ORDERED** that the **Defendants' Motion To Dismiss**

**Complaint** [#11] is denied.

Dated September 24, 2018, at Denver, Colorado.

**BY THE COURT:**

Bob Blackburn

Robert E. Blackburn
United States District Judge